UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

ENTERED
SEP 2 0 2005
TERESA L. DEPPNER, CLERK
U.S. District & Bankruptcy Courts
Southern District of West Virginia

UNITED STATES OF AMERICA

v.  CRIMINAL ACTION NO. 2:02-0087

ERNEST WISMAN

MEMORANDUM ORDER

Pursuant to the evidence adduced at the hearing held on August 26, 2005, on the petition seeking revocation of the defendant's supervised release, filed February 18, 2005, the court makes the following findings of fact by a preponderance of the evidence.

Laurie Lee Taylor and the defendant had been together on the evening of February 16, 2005, and the early morning hours of February 17th, with the understanding that the defendant would be permitted to stay in her apartment, sleeping on the couch in the living room, for the remainder of the night. At her request, the defendant was showing her around the city of Huntington, West Virginia, to which she had moved six months earlier. They had done so as well on the evening of February 15th and on a week-end just one or two weeks earlier. Ms. Taylor, age 50 at that time, and the defendant, age 41, had first met each other in the late

1980's or early 1990's.  The defendant was a friend of her husband, William Andy Burke.  The defendant and Ms. Taylor became good friends to the point that defendant once asked Ms. Taylor and Burke to adopt his son, Joshua.  Andy Burke got into trouble with the law about 1996, went to prison in 1998, and Burke and Ms. Taylor divorced.

The defendant himself went to prison in 2000 under a 2-year federal sentence on a racketeering charge which is the offense of conviction for which he is now on supervised release.  The defendant and Joshua's mother had separated and later divorced about 1992, after which the defendant was awarded custody of Joshua.  The defendant's brother was appointed as guardian for Joshua who, tragically, was murdered at the age of 18 in July 2003, soon after the defendant completed both his 2-year prison sentence and an additional six-month sentence for a supervised release violation.  The loss of Joshua had a profound depressive effect on the defendant.

Ms. Taylor and the defendant remained friends throughout their acquaintanceship down to February 17th.  Ms. Taylor hired the defendant for a brief period in 1997 or 1998 when she was operating the business known as "Mail Boxes, Etc." Although she first testified that she hadn't seen the defendant

since 1998 until seeing him at her daughter's home not long before the evening of February 16th, she saw him three or four times after 1998 prior to coming to Huntington in August 2004, and was with him on six or eight occasions thereafter, including those where defendant stayed at her apartment and visited bars with her. It is noted that the defendant was in prison from about March 2000 to December 5, 2001, and again from December 9, 2002, to June 6, 2003.

In the early morning hours of February 17th, the defendant and Ms. Taylor, after visiting a couple of bars, went to eat at Dwight's Waffle House. There Ms. Taylor, who had been drinking, got into an argument with two female patrons that developed into an altercation involving hair pulling and smacking. The defendant and a male with the two females pulled them apart. The cook called the police and the manager ordered all of them out of the establishment. Ms. Taylor became upset with the defendant because he had not taken up for her during the fight as she believed he should have done. They returned to her apartment about 3:30 a.m. and argued over Ms. Taylor's assertion that the defendant had not done enough to help her out at the restaurant. They then retired, with the defendant going to the couch and Ms. Taylor to her bedroom.

3

After a short while the defendant, clad in jeans and a T-shirt, came into her bedroom, said the couch was uncomfortable, and asked if he could stay in her bed. She allowed him to do so. She fell asleep and was awakened by the defendant who put his hands around her neck and was pushing her toward him while telling her to perform oral sex on him. It is noted that each the defendant and Ms. Taylor weighed about 170 pounds. Instead of engaging in fellatio, she managed to reach for and pull the pull cord at her bedside which set off a siren alarm. The defendant then grabbed her throat and thrust his thumb forcefully into her neck so hard as to bruise and redden the front of her neck while telling her not to tell anyone and threatening her if she did so.

At that point the attack came to an end and the defendant retreated to a chair in the living room. The manager and an assistant soon answered the alarm by entering Ms. Taylor's apartment. The manager did not notice any sign of a struggle. Ms. Taylor, who was still within the hearing of the defendant, said to the manager that everything was "o.k." The manager reset the alarm and returned to her apartment. The defendant left Ms. Taylor's apartment and was in his car about to drive out of the parking lot when Ms. Taylor hurried out and attempted to stop

him, mistakenly thinking he had taken her money and the keys to her apartment. He had done neither. The defendant pulled out of the lot and drove off.

Ms. Taylor then went directly to the manager's apartment where the manager soon heard her screaming outside. The manager allowed her inside the manager's unit and, noting that Ms. Taylor was very upset, heard her say she had been raped and that the defendant had taken her money and keys. An ambulance was called and Ms. Taylor was taken to the hospital. An investigating officer interviewed her there about 8:30 a.m. on February 17th but she was so emotional as to be unable to continue. The next day Ms. Taylor came to the police department and gave a written statement asserting that she had been raped by the defendant who she said awoke her having sexual intercourse with her. Ms. Taylor now says the defendant awoke her with his hands around her neck and telling her to perform oral sex on him.

When asked if the defendant were "erect," Ms. Taylor testified: "I really don't remember . . . I don't know if it was soft or hard . . ." The rape kit that was utilized and the samples obtained on February 17th included a vaginal swab on which no semen or seminal fluid was found. No seminal fluid was found on any of the other several items examined including oral,

5

finger and neck swabs, a bed sheet, a pull cord, a night gown and a "Betty Boop" pin. There was some blood collected from under the fingernails of her right hand.

The court finds that Ms. Taylor did not perform fellatio on the defendant and he did not rape her or engage in sexual intercourse with her or penetrate her vagina.

The court concludes that, as described herein, the defendant did commit an assault on Ms. Taylor under W.Va. Code § 61-2-9(b) in that he unlawfully committed an act that placed her in reasonable apprehension of immediately receiving a violent injury; and, alternatively, that the defendant did commit a battery on Ms. Taylor under W.Va. Code § 61-2-9(c) in that he unlawfully and intentionally caused physical harm to her.

The Clerk is directed to forward copies of this written opinion and order to all counsel of record and the defendant.

DATED: September 20, 2005

_____
United States District Judge